# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara L. Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

February 24, 2026

**By ECF**
Hon. Richard M. Berman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: **United States v. Bass Ndiaye**
     **25-Cr-349 (RMB)**

Dear Judge Berman:

This case presents a genuinely heartbreaking situation: the prosecution of a 23-year-old asylum seeker for his behavior during a mental health crisis that culminated in a suicide attempt.

In July 2025, Bass Ndiaye – a hardworking, law-abiding, non-violent young man – went to immigration court for a scheduled asylum hearing. After the hearing was adjourned, masked immigration agents suddenly seized Bass in the hallway and took him to a squalid, overcrowded detention area. The agents told Bass that he was going to be imminently deported. Bass, who was terrified of being sent back to the violence and persecution he faced in Senegal, had a psychiatric breakdown. Becoming hysterical, he attempted suicide: he tried to jump through a closed tenth-floor window, and stabbed himself repeatedly with scissors that had been left unattended. When security guards tried to subdue him, Bass momentarily moved his arms in their direction while still holding the scissors. No one was hurt besides Bass himself.

As forensic psychologists explain in their attached evaluation, Bass experienced "acute psychological decompensation" and "impaired functioning" during the chaotic incident. He has now spent seven months at the MDC on the instant assault charges, during which he has been unable to communicate with guards and other inmates and has had only minimal contact with his family in Senegal. Bass has been repeatedly placed on suicide watch and hospitalized for suicide attempts. And he still faces months more in immigration custody. For a young man going through "marked anxiety, despair, and acute suicidality," Bass has been punished enough.

Bass is obviously not a criminal. And the collateral consequences he faces are devastating: his misdemeanor conviction increases the likelihood that he will be deported to a country where he faces violence and discrimination. The government's prosecution of Bass for his behavior during a suicide attempt makes no sense, and there is no reason to impose additional jail time. The Court should sentence Bass to one day in jail for this misdemeanor offense.

## I.     FACTUAL BACKGROUND.

### A.  Bass's travel to the United States to escape persecution.

Now just 23 years old, Bass Ndiaye was born into deep poverty in Senegal. Bass's father lived abroad and only occasionally contacted the family. His mother made little money selling religious clothing on the streets of Touba. As a child, Bass was frequently left to care for his four younger siblings while his mother struggled to keep the family afloat.

Touba is considered the spiritual center of Mouridism, a branch of Sufi Islam. Religion dominates the political and cultural life of the city, and Bass spent his formative years in a devout Muslim family and community. He attended Quranic school and sold religious scarves to help support his family. Bass, however, faced well-founded fears of persecution from his local community and the Senegalese government.[1] Seeing only one chance for survival and freedom, he made the heartbreaking and difficult decision to flee Senegal.

Bass and his family managed to cobble together some money to finance the beginning of his journey, and he left Senegal alone in 2023. He had no support network and spoke only Wolof. Bass's goal was to make it to the United States. But his trip was long and arduous, taking him through multiple countries. He had to stop at various points as he ran out of money, selling clothing on the streets to finance the next leg of his voyage. He often slept in shelters or in alleys.

Bass finally made it to the United States at the end of 2023. Following the legal process in place at the time, he presented himself to border agents and claimed asylum. Immigration authorities gave him a court date and paroled him into the country. Bass then retained immigration counsel and filed a formal asylum application, abiding by the rules and procedures for obtaining lawful status.

Bass's first two years in the United States were not easy. He lived in a shelter before moving into a crowded apartment with friends. He worked a backbreaking construction job for exploitative wages before eventually finding a job with a delivery company in New York. Difficult as things were, Bass was a model immigrant: he lived a law-abiding life, supported himself, attended required immigration appointments, and eagerly awaited his asylum hearing.

### B.  Bass experiences a mental health crisis during the charged incident.

On July 18, 2025, 22-year-old Bass attended a scheduled immigration hearing at 26 Federal Plaza. His case was adjourned, and as he exited into the hallway a group of masked, anonymous immigration agents surrounded and seized him. The masked agents threw Bass and several others into an immigration holding cell. The holding area was filthy and overcrowded. In fact, just a few weeks later, Judge Lewis Kaplan would order the Trump Administration to improve the "squalid and cramped conditions" there, since detainees at 26 Federal Plaza faced "potentially 'unconstitutional and inhumane treatment.'" Luis Ferre-Sadurni, *Judge Steps Up Pressure on ICE to Fix Conditions in N.Y.C.*

---

[1] Since there is a possibility that Bass will be deported and face risks to his life and liberty in Senegal, this public-facing sentencing submission will not directly discuss the basis for his persecution-based fears. More detail is provided in the attached psychological report, which is requested to be accepted under seal. Ex. A at 3, 5.

*Holding Cells*, N.Y. Times (Sept. 17, 2025).[2]  Bass was confused and scared, since he had never been arrested before and had done nothing wrong.

The ICE agents ordered Bass out of his cell and told him that he was being transferred to immigration custody in another state for removal proceedings.  Bass could not understand what was going on: he had followed a lawful process, and his asylum claim had not yet been adjudicated.  He had not expected to be arrested as part of the Trump Administration's despicable immigration enforcement tactics.  Bass was, moreover, terrified about the prospect of being deported to Senegal, where he believed he faced violence and imprisonment.  He began to panic.

Bass noticed that a pair of scissors had been left unattended.  Planning to commit suicide, he grabbed the scissors and stabbed himself repeatedly, screaming things like "No, no, no," and "I don't want to go back." He then tried to jump through a closed glass window ten stories above the street.  As security guards tried to subdue him, a disoriented Bass swung his arms in the direction where the security guards were standing.  With the scissors still in his hand, Bass tried to hurt himself again.  The guards ultimately restrained him.  No one was injured besides Bass himself.

### C. Bass's extraordinarily challenging seven months at the MDC.

Bass was arrested and brought to federal court for his presentment on charges of assaulting a federal employee.  Since ICE had lodged a detainer, Bass was detained without objection.  He has been confined at the MDC since July 23.  During those seven months, he has faced challenges far beyond those of the typical pretrial inmate.

Other than visits with social worker Brittany Larson and myself, Bass has had practically no contact with anyone from the outside world.  The BOP is stubbornly reluctant to accommodate international calls, so Bass has barely spoken with his loved ones in Senegal.  Instead, his family frequently contacts Ms. Larson and I, desperate for information about Bass's wellbeing.  Bass has been the only Wolof speaker at the jail most of the time, or one of two.  None of the staff or correctional officers speak his language.  Bass has essentially spent seven months in solitude and silence.

Bass's mental health has been a continuing concern.  He has been taken to the hospital for multiple suicide attempts and been repeatedly placed on suicide watch.  Appointments with BOP psychologists have taken place through a phone interpreter service, leading to frequent miscommunication about his struggles and his strong desire to obtain treatment.  The language barrier has thus complicated his path to improvement.  He has been on and off psychiatric medications, and MDC "clinicians observed him to be reticent, aloof, and sad." Ex. A at 4.  Even the interpreter I retained to communicate with Bass has repeatedly contacted me to express concern about Bass's wellbeing.  During legal visits, Bass speaks little and sobs often.  It is almost unbearable to watch.

---

[2] The subhuman conditions of the holding cells at 26 Federal Plaza were corroborated by video evidence.  In those cells, migrants were "forced to sleep on the floor or sitting upright, and were deprived of showers, sufficient medical care and legal representation.  Some migrants said they had to contend with a stench emanating from shared toilets, which were in plain view of other detainees." *Id.*

### D. The forensic psychological evaluation.

Drs. Alexander Bardey and LaShonda Green conducted a forensic psychological examination of Bass last fall. They interviewed him at the MDC, reviewed his medical and psychiatric records, and read the complaint and discovery. Their report is attached as Exhibit A.

Drs. Bardey and Green diagnosed Bass with "major depressive disorder, recurrent, severe, without psychotic features," and added a rule-out diagnosis of "intellectual disability." Ex. A at 5-6. According to Drs. Bardey and Green, Bass presented "with significant psychological distress in the context of chronic identity-related stressors, fear of persecution, and acute situational threat triggered by immigration proceedings." *Id.*

Discussing the persecution and challenges Bass is likely to experience in Senegal, Drs. Bardey and Green explained that the "sociopolitical backdrop" in which Bass lived likely contributed to him developing behaviors associated with "anxiety, depression, and self-harm." *Id.* at 6. Regarding the charged conduct, Drs. Bardey and Green opined that it was the result of the "interaction of chronic vulnerability and acute precipitating stress." *Id.* They explained:

> The act of grabbing scissors with the intention of harming himself is best conceptualized as a crisis-driven response to the perceived inevitability of being returned to an environment where he reasonably believes he would face danger . . . . His behavior was impulsive and fear-based, emerging from an acute collapse of coping capacity under extreme emotional arousal. There is no indication that this behavior was manipulative; instead, it reflects a panic-mediated survival response to an intolerable threat.

*Id.* Drs. Bardey and Green characterized Bass as someone with "trauma-related symptoms and identity-based persecution anxiety," whose "self-harm gestures serve as markers of acute psychological decompensation in response to a culturally and personally catastrophic stressor." *Id.* They emphasized that stress about his immigration proceedings is an exacerbating factor that has contributed to Bass's intense psychiatric struggles. *Id.* at 7.

### E. Bass's acceptance of responsibility and the path forward.

Given that this incident involved a suicide attempt by a young man with no criminal history that occurred during an emotional breakdown and which resulted in no injuries, I requested that the government defer Bass's prosecution. The government, however, insisted that Bass plead guilty to misdemeanor simple assault. While a misdemeanor conviction would often be considered a good outcome, here it will complicate (although, depending on the sentence, not foreclose) Bass's path to immigration relief. On February 12, Bass accepted responsibility for misdemeanor simple assault. He faces a maximum sentence of twelve months' imprisonment. The parties have agreed to an expedited sentencing and waived a pre-sentence report.

After his sentencing, Bass will likely be transferred to immigration custody to litigate his asylum claim. He will spend an indeterminate amount of time in what will be subhuman detention conditions. Bass's loved ones are hopeful that, one way or another, Bass is out of custody soon and has an opportunity to continue receiving meaningful psychiatric support in the community.

To that end, Ms. Larson – the social worker with whom Bass has been working closely – has located several mental health programs Bass can attend if he is released from immigration custody. Those programs cater to individuals regardless of their immigration status. Among those programs is NYC Cares, a program our office has worked with in the past that provides mental health care to undocumented individuals. Bass is looking forward to hopefully obtaining lawful status, continuing to see a psychiatrist, and returning to work so he can support himself.[3]

Unfortunately, the current Administration's immigration enforcement efforts leave the path forward unclear. At this time next year, it is possible Bass will be back in the community, getting psychiatric care and working. Or he may be deported back to Senegal, where he faces the threat of violence and persecution. Or he may find himself shipped off to a third-world prison in a country where he has no ties at all. Under the current Administration, any of those outcomes are conceivable.

## II.    <u>THE COURT SHOULD SENTENCE BASS TO ONE DAY IN JAIL.</u>

There are some cases where the facts simply speak for themselves, and where continued incarceration is self-evidently inappropriate. This is such a case. The government is prosecuting Bass for his behavior during a suicide attempt, which was precipitated by a mental health crisis and during which no one was hurt but himself. As the forensic psychological evaluation makes clear, Bass's actions were not some well thought out, premeditated effort to harm federal employees. Bass has lived his entire life as a law-abiding, non-violent person. He suffered an emotional breakdown after being seized following an immigration hearing, thrown into subhuman detention conditions, and told he was about to be deported to a country where he faced violence and persecution. The "assault" that occurred here involved Bass swinging his arms in the direction of security guards while stabbing himself. It is hard to conceive of a sadder set of facts, or of a situation more deserving of empathy and mercy.

The § 3553(a) factors do not support additional incarceration. There is no deterrent value whatsoever in incarcerating someone for a suicide attempt or for behavior during an emotional breakdown. Nor is there any reason to believe the public needs protection from a law-abiding, deeply depressed person like Bass. The seven months he has already spent in jail is more than just punishment for what occurred, particularly given the low guidelines range, the challenges he has faced at the MDC, and the months of immigration detention that still await him.

And Bass's continued incarceration will not help to address his psychiatric issues. Considering the opinion of Drs. Bardey and Green that Bass's principal trigger for depression is anxiety about his unresolved immigration case, detaining him further on these charges and delaying the resolution of the immigration matter would be counterproductive. Making matters worse, Bass has received subpar care while in BOP custody, with psychiatric assistance filtered through a phone interpreter system that has failed to convey accurately even his basic desire for continued treatment. The treatment Bass can receive in the community will be far superior and effective, and should begin as soon as possible.

It is certainly important that people be held accountable for assaults on federal employees, but this case involves about the furthest thing imaginable from what we think of as an "assault." There is little question that, but for Bass's emotional collapse and accompanying "panic-mediated survival

---

[3] Although psychologists at the MDC claim that Bass has occasionally refused treatment, this appears to be the result of a language barrier and the use of a phone translation service. Bass is committed to receiving psychiatric care.

response," the charged incident never would have occurred. There is absolutely nothing in Bass's background indicative of criminality, much less violence. He does not belong in jail even one day longer for the conduct alleged here, given his background, the pitiful circumstances in which this incident occurred, and the statutory purposes of punishment.

Importantly, Bass is not seeking a "time-served" sentence. Bass has been at the MDC for seven months, and thus a "time-served" sentence would be viewed by an immigration court as the equivalent of a seven-month sentence. With regard to Bass's eligibility to continue litigating his asylum claim, an immigration judge will need to determine if the misdemeanor conduct here constitutes a "particularly serious crime." That determination involves weighing three factors: (1) the nature of the conviction, (2) *the type of sentence imposed*, and (3) the circumstances and underlying facts of the conviction. *Matter of E-A-S-O*, 29 I&N Dec. 422, 425 (B.I.A. 2026). Since the length of Bass's sentence has serious implications for his paths to immigration relief, we ask that the Court impose a clearly stated, short term of imprisonment. A one-day sentence would be sufficient but not greater than necessary here.

### III.    CONCLUSION

Bass Ndiaye is a non-violent, law-abiding, hardworking young man who has spent years living in fear of persecution and violence. The charged incident – a true aberration in Bass's life – occurred during a psychiatric emergency and thankfully resulted in no one being hurt. Sentencing Bass to additional jail time for what was self-evidently a suicide attempt would be inappropriate.

Therefore, the Court should impose a sentence of one day in jail.

Sincerely,

Michael Arthus
Assistant Federal Defender
212-417-8760

cc. (by ECF): AUSA Leslie Arffa